MICHELLE D. CHARRON & others[1] *vs.* EDWARD L. AMARAL
& others.[2]

Worcester. March 4, 2008. - July 10, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Consortium. Negligence,* Medical malpractice, Causing loss of consortium.

Discussion of the law regarding loss of consortium. [769-771]
Discussion of *Goodridge* v. *Department of Pub. Health,* 440 Mass. 309 (2003),
  which redefined the common-law meaning of civil marriage to mean the
  voluntary union of two persons as spouses, to the exclusion of all others.
  [771-772]
This court concluded that a same-sex spouse could not pursue an action for loss
  of consortium of her injured spouse, where the couple were not married
  when the personal injury cause of action accrued, and where the change to
  the common-law meaning of civil marriage effected by *Goodridge* v. *Depart-
  ment of Pub. Health,* 440 Mass. 309 (2003), applied prospectively. [772-773]
  MARSHALL, C.J., concurring, with whom COWIN and BOTSFORD, JJ., joined.

CIVIL ACTION commenced in the Superior Court Department on
May 21, 2004.

A motion for partial summary judgment was heard by *Francis
R. Fecteau,* J., and the case was reported by him to the Appeals
Court.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Kathy Jo Cook* (*Ann Marie Maguire* with her) for the plaintiffs.
*John J. Barter* (*Amy Delisa* with him) for Laura J. Bessette.
*J. Peter Kelley,* for Edward L. Amaral, was present but did
not argue.

*Lee M. Holland, Pauline Quirion, & Martin W. Healy,* for
Massachusetts Bar Association, amicus curiae, submitted a brief.

[1]Cynthia J. Kalish and Hannah E. Kalish, Charron's spouse and daughter,
respectively. While no suggestion of death has been filed, the plaintiffs state
that Charron is now deceased and that Kalish has been appointed administra-
trix of her estate.

[2]Laura J. Bessette and Fallon Clinic, Inc.

*Mary L. Bonauto & Janson Wu*, for Gay & Lesbian Advocates & Defenders, amicus curiae, submitted a brief.

IRELAND, J. We transferred this case from the Appeals Court after a Superior Court judge reported the propriety of his ruling allowing the defendants' motion for partial summary judgment in a medical malpractice action involving a same-sex couple. Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996). In the motion, the defendants contended that the plaintiff Cynthia Kalish's claims for the loss of consortium of the plaintiff Michelle Charron could not be proved because Kalish was not married to Charron at the time the alleged cause of action accrued. The judge concluded that summary judgment was "required based upon the current state of the law."

The judge reported the following questions:

> "A. Did the court err in allowing the defendants' Motion for Summary Judgment?

> "B. Can a same sex spouse pursue a claim for the loss of an injured spouse's consortium where the couple was not married when the personal injury cause of action accrued but can demonstrate that they would have been married if so permitted by law, and the couple did in fact marry when permitted following *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309 (2003) [(*Goodridge*)]?

> "C. Can the marital rights recognized by *Goodridge*, including the loss of spousal consortium, be retroactively applied to a same sex married couple who can demonstrate that they would have been married when the cause of action for personal injuries on behalf of one of them accrued had the Commonwealth recognized such a union?"[3]

1. We set forth the following agreed-on facts contained in the judge's report. Kalish and Charron met in 1986, started dating in March 1990, and dated monogamously for two years. In 1992, they decided to live together. They first moved into an apartment

---

[3]Pursuant to Mass. R. Civ. P. 64, as amended, 423 Mass. 1403 (1996), a trial judge "may not report a question of law, but may report the propriety of an interlocutory order." *Connors* v. *Boston*, 430 Mass. 31, 34 n.9 (1999), quoting *Colella* v. *Commonwealth*, 417 Mass. 433, 434 (1994).

and later jointly purchased a house. In 1994, "they exchanged rings in a private ceremony." Through an anonymous donor program, Kalish conceived a child, who was born in 1998 and was "jointly adopted" by Kalish and Charron.

The couple shared all household expenses, including the expenses for the child, and Charron obtained a family health insurance policy. In 1999, they executed legal documents, including durable powers of attorney, wills, health care proxies, and life insurance policies, each granting the other the necessary legal authority or naming the other as her beneficiary.

In December, 2002, Charron sought treatment for a lump in her breast and was diagnosed with breast cancer in July, 2003. At that time she and Kalish were not married. Pursuant to the *Goodridge* holding, however, they applied for a marriage license on the first day the Commonwealth permitted it, May 17, 2004, and were married on May 20, 2004.

2. Some discussion of the law of loss of consortium and of our decision in *Goodridge* is in order.

a. *Loss of consortium.* "When a spouse suffers personal injury as a result of the negligence of a third party, the other spouse may recover damages from the third party for loss of consortium." *Olsen* v. *Bell Tel. Lab., Inc.*, 388 Mass. 171, 176 (1983), citing *Diaz* v. *Eli Lilly & Co.*, 364 Mass. 153, 167-168 (1973). Historically, a claim for a loss of consortium was a man's right to recover for the loss of consortium of his wife. See *Diaz* v. *Eli Lilly & Co.*, *supra* at 154-156 (discussing history of loss of consortium). Over time, the appellate courts have expanded the class of persons that has the right to a claim for a family member's loss of consortium. See *id.* at 167 (wife for husband); *Ferriter* v. *Daniel O'Connell's Sons*, 381 Mass. 507, 516 (1980) (dependent child for parent); *Angelini* v. *OMD Corp.*, 410 Mass. 653, 661-662 (1991) (fetus, later born alive, for parent). See also *Morgan* v. *Lalumiere*, 22 Mass. App. Ct. 262, 270 (1986) (disabled adult, dependent on parent). Accord *Angelini* v. *OMD Corp.*, *supra* at 655-656 (discussing decisions from Appeals Court that clarify persons eligible to recover). In addition, the Legislature enacted G. L. c. 231, § 85X, inserted by St. 1989, c. 259, § 1, to allow a parent to recover for the loss of consortium of a child in response to this court's decision in

*Norman* v. *Massachusetts Bay Transp. Auth.*, 403 Mass. 303, 306 (1988).

A claim for a loss of consortium cannot arise unless the family member has, inter alia, a legal relationship with the injured third party. See, e.g., *Fitzsimmons* v. *Mini Coach of Boston, Inc.*, 440 Mass. 1028 (2003). In the case of adult couples, the legal relationship is established by marriage. *Feliciano* v. *Rosemar Silver Co.*, 401 Mass. 141, 142 (1987). This court consistently has rejected the idea that cohabiting adults, even those who could demonstrate a commitment to each other, could recover. In *Feliciano* v. *Rosemar Silver Co.*, *supra* at 141-142, an unmarried couple lived together for approximately twenty years. They were married two years after the husband was injured. The wife argued that she should be allowed to recover for loss of consortium, despite the fact that she and her husband were unmarried at the time the injury accrued, because they had held themselves out as husband and wife, jointly had a bank account and house, filed joint tax returns, and, to the exclusion of others, turned to each other for, among other things, companionship. This court stated that its recognition of a spouse's right to recover for the loss of consortium promoted the values inherent in marriage: "the foundation of the family . . . a social institution of the highest importance." *Id.* at 142, quoting *French* v. *McAnarney*, 290 Mass. 544, 546 (1935). The court rejected the wife's argument that it should instead allow the right to recover for a loss of consortium in a " 'stable and significant' relationship." *Feliciano* v. *Rosemar Silver Co.*, *supra*, quoting *Butcher* v. *Superior Court*, 139 Cal. App. 3d 58, 70 (1983). The court said, "[A]s a matter of policy . . . tort liability cannot be extended without limit. Distinguishing between the marriage relationship and the myriad relationships that may exist between mere cohabitants serves the purpose of limiting protection of interests and values that are reasonably ascertainable." *Feliciano* v. *Rosemar Silver Co.*, *supra*, citing *Diaz* v. *Eli Lilly & Co.*, *supra* at 165. Accord *Angelini* v. *OMD Corp.*, *supra* at 661-662 (limiting scope of recovery for loss of parental consortium for fetus, later born alive, to child conceived when parent was injured and who demonstrates expectation of dependent relationship).

In *Fitzsimmons* v. *Mini Coach of Boston, Inc.*, *supra*, a case

decided after our *Goodridge* decision, this court rejected the plaintiff's invitation to reconsider the *Feliciano* holding in light of greatly changed social mores concerning cohabitation. Noting that the couple could have married, but chose not to, the court stated, "A loss of consortium claim presupposes a legal right to consortium of the injured person." *Fitzsimmons* v. *Mini Coach of Boston, Inc., supra* at 1028. The court concluded by stating that the Commonwealth has a "deep interest" in upholding the integrity of marriage.[4] *Id.*, quoting *Feliciano* v. *Rosemar Silver, Co., supra* at 142-143. Moreover, the Legislature has not seen fit to enact a statute overruling our decisions and to allow those who cohabitate to recover for loss of consortium. Contrast G. L. c. 231, § 85X, enacted in response to *Norman* v. *Massachusetts Bay Transp. Auth., supra*.

We recognize that, in all of these cases, the couples could have married had they chosen to do so. That option was not available to Kalish and Charron until our decision in *Goodridge*. We therefore discuss the *Goodridge* decision and then consider Kalish's argument that our decision entitles her to a loss of consortium claim.

b. *The* Goodridge *decision*. In *Goodridge*, this court declared that because the marriage licensing statute, G. L. c. 207, limited the "protections, benefits, and obligations of civil marriage" to opposite sex couples, it violated "the basic premises of individual liberty and equality under the law protected by the Massachusetts

---

[4]As an amicus brief submitted by the Gay & Lesbian Advocates & Defenders in *Fitzsimmons* v. *Mini Coach of Boston, Inc.*, 440 Mass. 1028 (2003), pointed out, by 2003, this court had recognized numerous types of families and had developed relationship-oriented tests in other areas of law. See, e.g., *Blixt* v. *Blixt*, 437 Mass. 649, 654-655, 657-659 (2002), cert. denied, 537 U.S. 1189 (2003) (difficult to speak of average American family; test for significant preexisting relationship between grandparent and child); *Turner* v. *Lewis*, 434 Mass. 331, 334-336 (2001) (civil protective order statute must be applicable to reality of diverse family relationships); *E.N.O.* v. *L.L.M.*, 429 Mass. 824, 829-831, cert. denied, 528 U.S. 1005 (1999) (increasing number of same-sex couples having children; discussing de facto parenthood); *Adoption of Tammy*, 416 Mass. 205, 206 (1993) (same-sex couple may jointly adopt children). Despite its recognition of the diverse nature of family relationships, and its decision in *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309 (2003) (*Goodridge*), this court affirmed the marriage requirement for loss of spousal consortium. *Fitzsimmons* v. *Mini Coach of Boston, Inc., supra*. See *Goodridge, supra* at 334 (discussing changing nature of families).

Constitution." *Id.* at 313, 342. The court did not strike down the marriage statute; instead, it "refined the common-law meaning of [civil] marriage . . . to mean the voluntary union of two persons as spouses, to the exclusion of all others." *Id.* at 343. "[M]indful that [its] decision mark[ed] a change in the history of [the Commonwealth's] marriage law," the court stayed the entry of judgment of its decision "for 180 days to permit the Legislature to take such action as it may deem appropriate." *Id.* at 312, 344. "The purpose of the stay was to afford the Legislature an opportunity to conform the existing statutes to the provisions of the *Goodridge* decision." *Opinions of the Justices*, 440 Mass. 1201, 1204 (2004).

The *Goodridge* court devoted more than one page of its opinion to a nonexhaustive list of the numerous benefits that flowed from the legal status of marriage, including a right to claim the loss of consortium of a spouse. *Goodridge, supra* at 323-325. The court stated that these "benefits [were] accessible *only* by way of a marriage license" (emphasis added). *Id.* at 323. It also stated that "civil marriage has long been termed a 'civil right' " because of the many benefits that are accessible and "for its intimately personal significance." *Id.* at 325, citing *Loving* v. *Virginia*, 388 U.S. 1, 12 (1967).

3. For ease in understanding, we do not address the reported questions in sequence. Kalish argues that we should answer the second and third reported questions in the affirmative because it would violate the equal protection and due process provisions of the Massachusetts Constitution to deny her the right to recover for the loss of consortium and because, although she and Charron were prohibited from marrying, her relationship with Charron satisfies the other criteria this court uses to determine whether someone can recover.

Kalish contends that because the denial of the right of same-sex couples to marry violated the Massachusetts Constitution, all the laws that required (exclusively opposite sex) marriage as a prerequisite to certain rights were derivatively unconstitutional. We need not analyze this assertion because, in any event, it does not aid her position. As *Goodridge* recognized, where a change in law is so radical that the consequences of that change realistically require time for the Legislature to act, a court may make the

remedy for unconstitutional laws prospective only. *Id.* at 312, 344, citing *Michaud* v. *Sheriff of Essex County*, 390 Mass. 523, 535-536 (1983) (court mindful that it changed history of marriage law). It is obvious that *Goodridge* was intended to apply prospectively; thus, it is not necessary for us to address Kalish's contention that we should apply *Goodridge* retroactively.

We also reject Kalish's argument that we should allow her to recover for the loss of consortium because she meets all other criteria for recovery and would have been married but for the legal prohibition. *Goodridge* granted same-sex couples the right to choose to be married after a specific date; the court never stated that people in same-sex, committed relationships (including the *Goodridge* plaintiffs, who had applied for, and were denied, marriage licenses) would be considered married before they obtained a marriage license. Nor did it state that it was amending, in any way, the laws concerning the benefits available to couples who marry to make up for past discrimination against same-sex couples. Instead, as discussed, one of the grounds on which the *Goodridge* court based its decision regarding the constitutionality of the marriage licensing statute was that so many benefits flowed only from being married. *Goodridge, supra* at 323.

Moreover, however sympathetic we may be to the discriminatory effects the marriage licensing statute had before our *Goodridge* decision, as counsel conceded at oral argument, to allow Kalish to recover for a loss of consortium if she can prove she would have been married but for the ban on same-sex marriage could open numbers of cases in all areas of law to the same argument. As *Goodridge* pointed out, "[t]he benefits accessible only by marriage are enormous, touching nearly every aspect of life and death. The [D]epartment [of Public Health] states that 'hundreds of statutes' are related to marriage and marital benefits." *Id.* at 323.

4. *Conclusion.* For the reasons set forth above, we answer all the reported questions in the negative and affirm the grant of summary judgment concerning Kalish's claims for a loss of consortium. The case is remanded for further proceedings consistent with this opinion.

*So ordered.*

MARSHALL, C.J. (concurring, with whom Cowin and Botsford, JJ., join). I agree that summary judgment was properly entered for the defendant. I write separately to clarify my reasons for reaching that decision.

The essence of the plaintiff's argument is that *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309 (2003) (*Goodridge*), authorizes the court to confer marital rights retrospectively on a same-sex spouse who is able to show that she and her partner would have been married at the time a cause of action for loss of consortium accrued, had the law so allowed. Not only does *Goodridge* fail to support a retroactive application of marital rights; it does not permit such retroactivity.

The plaintiffs in *Goodridge* did not seek a judicial declaration that they were legally married, or request an order to attain any rights or benefits conferred by the status of civil marriage. They requested "only a declaration that their exclusion and the exclusion of other qualified same-sex couples from access to civil marriage violates Massachusetts law." *Id.* at 344. We granted the plaintiffs' request for declaratory relief on the ground that "barring an individual from the protections, benefits, and obligations of civil marriage solely because that person would marry a person of the same sex" was unconstitutional. *Id.* We refined the common-law meaning of marriage to be "the voluntary union of two persons as spouses, to the exclusion of all others," *id.* at 343, and directed the Superior Court to delay entry of judgment for 180 days "to permit the Legislature to take such action as it may deem appropriate" in response to our declaration. *Id.* at 344.

However, contrary to the court's opinion, it is not the case that the *Goodridge* court made its ruling "prospective" because its consequences were "so radical that the . . . change realistically require[d] time for the Legislature to act." *Ante* at 772. The *Goodridge* decision did not change the nature of civil marriage in the Commonwealth; it made the laws of civil marriage accessible to a class of individuals who had been unconstitutionally barred from such access. The Legislature, we emphasized, retained its "broad discretion" to define and regulate the "protections, benefits, and obligations" of civil marriage. *Goodridge, supra* at 343-344. And our decision did not disturb the Commonwealth's strong public policy favoring a clearly defined, unambiguous legal status

for civil marriage. See, e.g., *id.* at 342-343 (civil marriage is "a vital organizing principle of our society"). See also *Wilcox* v. *Trautz*, 427 Mass. 326, 330, 332 (1998).

Moreover, we did not, as the court states, make our decision in *Goodridge* "prospective," *ante* at 773, but rather delayed its implementation. This is a distinction with a difference. Prospectivity is proper where a decision would disadvantage those whose existing contractual and property arrangements were predicated on (have relied on) then-existing decisional law. See *Powers* v. *Wilkinson*, 399 Mass. 650, 662 (1987). A decision applied prospectively generally takes effect on issuance of the decision. Delaying the implementation of a decision is a matter of the deference owed by one branch of government to the other in the task of effecting an orderly system of laws. See, e.g., *Jean W.* v. *Commonwealth*, 414 Mass. 496, 499 & n.3 (1993) (Liacos, C.J., concurring) (delaying for one legislative session decision to abolish "public duty rule" prospectively to give Legislature opportunity to consider forthcoming change in decisional law, and "to make any preparations for the change that it deems appropriate"); *Michaud* v. *Sheriff of Essex County*, 390 Mass. 523, 535-536 (1983) (considering and balancing public interests in improving unconstitutional conditions in county jail and delaying implementation of order to improve conditions to give county officials opportunity to seek public funds required to carry out order). The decision to delay implementation of our decision in *Goodridge* was to permit an orderly administration of that decision. See *Opinions of the Justices*, 440 Mass. 1201, 1204 (2004).

The circumstances of this case are moving, a vivid reminder of the constitutional mandate of equality under the law and the costs imposed when society falls short of that mandate. But the relief the plaintiff seeks — recognition of a loss of consortium claim nunc pro tunc — would erase the bright line between civil marriage and other forms of relationship that has heretofore been carefully preserved by the Legislature and our prior decisions, including *Goodridge*. Granting such relief would create in effect a common-law or de facto quasi marital status that would promote litigation, permit judges to select from among marital benefits to which quasi marital couples might or might not be entitled,[1]

---

[1]Although the plaintiff states that selective exceptions to the marriage

create uncertainty in the private[2] as well as the public sphere[3] about who is (or was) quasi married and for what purpose, and undercut the Legislature's role in defining the qualifications and characteristics of civil marriage.

---

statutes should be limited to same-sex individuals who could prove that they were "functionally married" prior to *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309 (2003), and that statutes of limitations make this group a rapidly shrinking one, she then proceeds to argue that "equal protection" demands that all same-sex couples not be "denied arbitrarily benefits that are available to opposite-sex couples." Her arguments illustrate that if we blur the line separating civil marriage from other forms of relationships, judicial selection from among the protections, benefits, and obligations of marriage would be difficult, if not impossible, to justify coherently when decided on a case-by-case basis.

[2]For example, many defined benefit and defined contribution plans rely on clearly ascertainable rules about who is legally married.

[3]For example, a surviving spouse has certain rights of inheritance where a spouse dies intestate. See, e.g., G. L. c. 190, § 1.